**Ronald E. CUMMINGS, Appellant and Cross–Appellee,**

v.

**SEA LION CORPORATION, Appellee and Cross–Appellant.**

**Nos. S–6191, S–6192.**

Supreme Court of Alaska.

Oct. 17, 1996.

Rehearing Denied Nov. 19, 1996.

---

A. Lee Petersen, Anchorage, for Appellant/Cross–Appellee.

Kevin G. Clarkson, Brena & McLaughlin, Anchorage, for Appellee/Cross–Appellant.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

*OPINION*

RABINOWITZ, Justice.

## I. INTRODUCTION

Sea Lion, a Native corporation, sued Ronald Cummings, its former attorney, for professional negligence and fiduciary fraud. A jury awarded Sea Lion both compensatory and punitive damages. Cummings appeals, and Sea Lion cross appeals. We affirm.[1]

## II. FACTS AND PROCEEDINGS

Sea Lion Corporation is an Alaska Native corporation organized pursuant to the Alaska Native Claims Settlement Act. Myron Naneng has served as a board member of Sea Lion since 1979 and as president since 1983. James Joseph has served as secretary/treasurer of Sea Lion since 1979. Cummings served as Sea Lion's general legal counsel from 1980 to 1990.[2] The scope of his responsibilities is subject to debate. In a May 31, 1985 letter to Sea Lion, Cummings described himself as Sea Lion's general counsel and stated that he personally provided legal advice and service "on all strategic, high-level, long-range planning and in the areas of fundamental analysis and decision making." However, at trial Cummings testified that he and his firm only rendered legal service which Sea Lion specifically requested from them.

Cummings also began representing Larry Gillespie in 1980. Gillespie hired Cummings to assist him with the legal aspects of forming and eventually running an aviation business in Alaska, known as Air Valley. Cummings and Gillespie orally agreed that Cummings would perform legal work relating to Air Valley's formation on a contingent fee basis. Specifically, Cummings and Gillespie agreed that Cummings and his firm would be paid for legal services only if Air Valley was able make a profit in the aviation business. From 1980 through 1983, Cummings and his associates performed over $27,000 worth of legal work for Gillespie. However, in 1983 the Air Valley project was abandoned when it became clear that Gillespie was unable to obtain financing to purchase aircraft.

In early 1983, Sea Lion became interested in acquiring an air taxi certificate to provide air transportation to Hooper Bay. Cummings introduced Gillespie to Sea Lion. Cummings told Sea Lion that Gillespie was a knowledgeable aviation consultant who could assist Sea Lion in acquiring an air taxi certificate. Cummings and Gillespie then assisted Sea Lion in forming an air taxi service to be known as Uniaq Air Service. Cummings and Gillespie assisted Sea Lion in acquiring an air taxi certificate in the name of Uniaq, Gillespie assisted Sea Lion in locating an airplane and hiring a pilot, and Cummings assisted Sea Lion in forming Uniaq as a subsidiary corporation for the purpose of limiting Sea Lion's liability.[3]

---

\* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. This court previously considered facts related to this case in *Sea Lion Corp. v. Air Logistics*, 787 P.2d 109 (Alaska 1990) (*Sea Lion I*).

2. During his representation of Sea Lion, Cummings practiced law as a sole practitioner, then as a partner in Cummings & Routh, then as a partner in Cummings, Clark & Tugman, then as a sole practitioner in the Law Offices of Ronald E. Cummings.

3. Cummings testified that he never recommended that Sea Lion have any other dealings with Gillespie. Cummings further testified that

Thereafter, Gillespie approached Sea Lion with a proposal for another air service business. Gillespie told Sea Lion that if he had access to large transport aircraft, he could obtain contracts with the Alaska National Guard to haul personnel and equipment to and from Nome. Gillespie wanted to contract with Air Logistics of Alaska, Inc. (Air Log) to fly its large "CASA" transport aircraft. Gillespie requested Sea Lion to finance flight services from Air Log through loans which he would repay out of profits he would make on the National Guard contracts.[4]

Sea Lion made two loans to Gillespie totaling $78,500 which financed his performance on two separate National Guard contracts. Sea Lion asked Cummings to draft promissory notes in which Gillespie promised to repay the loan with interest. Gillespie repaid Sea Lion's loans in full, with interest.

Gillespie then asked Sea Lion for a loan to start an air transport company to be called Bush Transport Systems (BTS). Gillespie wanted to utilize Air Log's "CASA" aircraft to perform additional contracts with the National Guard and other customers for air transport services in Alaska. Sea Lion agreed to loan Gillespie $75,000. Gillespie scheduled a meeting for October 1, 1984 between Naneng and Air Log's Division Manager, Mike Rizk. At this meeting, Naneng was presented with a flight service agreement (1984 FSA) between BTS and Air Log whereby Air Log agreed to provide aircraft and services to BTS through December 31, 1984 and BTS agreed to compensate Air Log. Gillespie and Rizk informed Naneng that if he did not sign the agreement Air Log would remove the "CASA" aircraft from Alaska. Naneng signed the 1984 FSA.

Soon thereafter Cummings learned that Naneng had signed the 1984 FSA, and realized that Naneng's signature could obligate Sea Lion to Air Log for payments on the contract.[5] Cummings drafted a promissory note for the $75,000 loan from Sea Lion to Gillespie. In addition, Cummings advised Sea Lion that it could limit its liability in BTS to that of a creditor. Cummings' office drafted a "Memorandum of Understanding" (MOU) to be signed by Gillespie and Sea Lion. In the MOU, Naneng and Gillespie agreed that Naneng's signature was not intended to obligate Sea Lion on the 1984 FSA, but was "for security purposes only." Cummings advised Sea Lion that the MOU would relieve Sea Lion of contractual responsibility to Air Log on the 1984 FSA. Air Log never saw the MOU nor learned of its terms or its existence.

On October 27, 1984, Cummings and Gillespie attended a Sea Lion board meeting. Gillespie made a presentation regarding his plans for BTS, and Cummings discussed Sea Lion's involvement in BTS. Specifically, he advised Sea Lion that it could limit its liability in BTS. Cummings also informed Sea Lion that he had represented Gillespie on legal matters in the past. However, Cummings did not mention that Gillespie owed him over $27,000 in unpaid legal fees, or that Cummings' payment was contingent upon Gillespie's making a profit in the aviation business.

On November 9, 1984, Sea Lion's board voted to become a limited partner in BTS. Sea Lion then authorized another $81,000 advance to Gillespie. Thereafter, Cummings and an associate, John Sivertsen, commenced drafting BTS limited partnership documents including a limited partnership agreement, a

he made his previous relationship with Gillespie very clear to Sea Lion and informed Sea Lion that he would not recommend Gillespie for any other purpose.

4. Cummings testified that he subsequently became aware of some arrangement between Sea Lion and Gillespie, but that this information was conveyed to him on an informal basis and he was not involved professionally.

5. Cummings testified as follows:
I told [Naneng] I thought we had long since progressed past the point of having binding

contracts with—being signed by him with no board approval, no attorney's advice, no CPA's advice. That even though it is a strange document and some strange signatures, that this kind of thing can be dangerous and it could make Sea Lion personally liable. In other words, I—I would characterize it I read him the riot act.
Cummings also testified that he did not become aware of Sea Lion's involvement in BTS until mid-October.

limited partnership prospectus, and a certificate of limited partnership. Throughout the drafting process, Cummings and Sivertsen frequently conferred with Gillespie and incorporated his concerns and suggestions into the limited partnership documents. Cummings billed Sea Lion for the time that he and Sivertsen spent conferring with Gillespie.

On April 11, 1985, Gillespie and Naneng attended another meeting with Rizk in Anchorage. At this meeting, Gillespie and Rizk presented Naneng with a flight services agreement for the calendar year of 1985 that was similar to the 1984 FSA, but involved two "CASA" aircraft. Naneng was again told that if he did not sign the agreement, Air Log would remove the aircraft from Alaska. Naneng signed the agreement.[6]

On April 30, 1985, Cummings and Gillespie memorialized their contingent fee agreement in writing. Cummings agreed with "Larry D. Gillespie, d/b/a Air Valley" that the legal fees which Gillespie owed to Cummings would be paid if and when Gillespie or Air Valley realized profits in the aviation business.

On May 16, 1985, Cummings conducted a final review of the limited partnership documents and, after obtaining Gillespie's signature thereon, forwarded final copies of the documents to Naneng. The documents referenced and incorporated the 1985 FSA as Exhibit A. On May 18, the Sea Lion board voted to become a limited partner in BTS and the limited partnership documents were signed.

BTS fell behind on payments for services rendered by Air Log under the 1985 FSA. Air Log sued Sea Lion, BTS and Gillespie to collect a debt of over $250,000. Cummings advised Sea Lion that Air Log was "jumping to conclusions," that Sea Lion was only a secured creditor of BTS until the limited partnership was formed, and that after the partnership was formed Sea Lion was simply a limited partner with limited liability. Cum-

mings asked Joseph to send him the MOU, advising him it was "the all important document" that would "conclusively close the subject" on Air Log's claims.

Air Log made several offers to settle its claims with Sea Lion for the amounts of $250,000 in January 1988, $350,000 in May 1988, and $363,814 in July 1988. Air Log's offer of $363,814 was in the form of an offer of judgment. Naneng testified that Cummings never communicated these offers to Sea Lion. While there is no documentary evidence which reflects that Cummings ever communicated these offers, Cummings testified that he verbally communicated these offers to Sea Lion. In late 1989, Cummings advised Sea Lion to make a series of settlement offers to Air Log in the amounts of $100,000, $200,000 and $250,000. These offers were not accepted by Air Log.

The superior court granted summary judgment in favor of Air Log on the issue of liability, concluding among other things that Sea Lion was directly liable to Air Log as a signatory on the 1984 and 1985 FSAs. The superior court then entered final judgment against Sea Lion in the amount of $276,474.02. The total final judgment entered against Sea Lion was $411,127.63.

Cummings advised Sea Lion that it had a seventy percent chance of winning on appeal, and that an appeal would cost about $10,000. Sea Lion appealed, and we affirmed the superior court's judgment on the ground that Sea Lion was a direct signatory to the contract. *Sea Lion I*, 787 P.2d at 116. Sea Lion then paid Air Log $480,179.32.

Thereafter, Sea Lion filed an action against Cummings alleging professional negligence and fiduciary fraud. Sea Lion requested compensatory damages representing Sea Lion's investment in BTS, the judgment Sea Lion paid to Air Log, the attorney's fees Sea Lion paid to Cummings in the Air Log litigation, and the costs that Sea Lion incurred in appealing the judgment in favor of

**6.** In *Sea Lion I*, we noted that when Naneng showed Joseph the 1985 FSA bearing Naneng's signature, Joseph realized that Naneng's signature exposed Sea Lion to the risk of liability and told Naneng, "Myron, come on, you shouldn't have signed this." 787 P.2d at 113. Cummings

points out in his brief that Naneng had been repeatedly advised that he should not sign anything that made Sea Lion directly liable. In addition, Cummings notes that Naneng did not consult with Cummings before signing the FSA.

Air Log. Sea Lion also sought an award of punitive damages.

The jury found that Cummings was professionally negligent, that he had committed fiduciary fraud, and that his negligence and fraud were legal causes of Sea Lion's damages. The jury awarded the following damages to Sea Lion: $480,000 for the judgment paid to Air Log; $100,000 for legal fees paid to Cummings; and $70,000 for the costs of the Air Log appeal. The jury also found that Sea Lion was thirty-four percent comparatively negligent. Based on Sea Lion's comparative negligence, the award of $650,000 was reduced to $429,000. The jury also found that Cummings' fiduciary fraud warranted an award of $106,000 in punitive damages.

Cummings filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and also moved for remittitur or for a new trial. The superior court denied these motions, and entered final judgment in favor of Sea Lion in the amount of $818,942.38.

Cummings now appeals, and Sea Lion cross-appeals.

## III. *DISCUSSION*

### A. *The Superior Court Did Not Err With Regard to Certain Evidentiary Rulings* .[7]

Cummings asserts that the superior court erred in admitting certain evidence. Specifically, Cummings argues that the superior court erred in admitting evidence relating to conflicts of interest, formation of the limited partnership, malpractice insurance, and testimony by Sea Lion's expert, Professor John Strait.

#### 1. *Conflicts of Interest and Formation of Limited Partnership*

Sea Lion argued to the jury that Cummings breached his duty of professional care

by failing to reasonably advise Sea Lion of his conflicts of interest stemming from his relationship with Gillespie and by failing to reasonably advise Sea Lion of its liability on the 1985 FSA. Cummings contends that any evidence relating to conflicts of interest and to formation of the limited partnership should have been excluded. Specifically, Cummings contends that such evidence is irrelevant to any damages suffered by Sea Lion because this court decided *Sea Lion I* based on contractual liability rather than partnership liability. In response, Sea Lion argues that such evidence is relevant because

> Sea Lion's compensatory damages, Cummings' breach of the standard of professional care, and Cummings' breach of fiduciary duty all arose out of the history of Cummings' relationship with Gillespie, the BTS limited partnership formation, and the execution, referencing, and incorporation of the 1985 FSA into the BTS limited partnership documents (not to mention the MOU's drafting and execution).

Relevant evidence is "evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." Alaska R. Evid. 401. With certain exceptions, "[a]ll relevant evidence is admissible." Alaska R. Evid. 402.

Here evidence pertaining to the conflicts of interest is relevant, since Sea Lion seeks to prove that it would not have suffered any damages if it had known about Cummings' conflicts. Evidence of the limited partnership is also relevant, primarily because of the complicated history of dealings between Gillespie, Cummings, Sea Lion and the various corporations. More particularly, evidence pertaining to the limited partnership is relevant for the purpose of establishing the context of the advice which Cummings gave to Sea Lion throughout their attorney-client relationship.

---

7. We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Agostinho v. Fairbanks Clinic*, 821 P.2d 714, 716 n. 2 (Alaska 1991). "We will find that a trial court abused its discretion only 'when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling.'" *Dura Corp. v. Harned*, 703 P.2d 396, 402 (Alaska 1985) (quoting *Peter Pan Seafoods v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982)).

Cummings also argues that the evidence relating to Cummings' conflicts of interest and the limited partnership evidence "confused the issues and misled the jury, to the unfair prejudice of Cummings."[8] However, Cummings' argument is actually a restatement of the claim that the questioned evidence is irrelevant. In our view, the probative value of this evidence is not outweighed by the danger of confusing the issues before the jury or misleading the jury. We hold that the superior court did not abuse its discretion by admitting evidence relating to Cummings' conflicts of interest and the formation of the limited partnership.

### 2. Strait's Expert Testimony

Cummings argues that the superior court abused its discretion by allowing Professor Strait to testify. Specifically, Cummings claims that Strait testified too early in the trial, that Strait's opinions were not based on evidence presented at trial, that the testimony was irrelevant because it did not "pertain to anything related to Sea Lion's losses," and that under Evidence Rule 403 analysis the testimony's probative value, if any, was outweighed by its prejudicial value.

First, Cummings cites no authority for the proposition that Strait's testimony was presented too early during the course of the trial. Therefore, we consider that argument to be without merit.

■ Regarding Cummings' second claim, that Strait based his testimony on evidence not presented at trial, Alaska Rule of Evidence 703 is instructive. That rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

In formulating his opinion, Strait reviewed the depositions of all the major witnesses, all relevant documents including the limited partnership documents, correspondence between Cummings and Sea Lion, Joseph's and Naneng's notes of their phone conversations with Cummings, and all the pleadings filed in the Sea Lion I case. Cummings does not assert that such evidence is different from the sort that reasonable experts in the field would normally rely upon. Therefore, Professor Strait's testimony does not violate Rule 703 on that ground.

We hold that the superior court did not abuse its discretion by admitting Strait's testimony.

### 3. Malpractice Insurance

Cummings argues that the superior court abused its discretion by admitting evidence which potentially suggested that Cummings had malpractice insurance when, in fact, he did not.

Specifically, Cummings objects to instances where the superior court allowed the jury to hear testimony and to consider evidence regarding malpractice insurance and liability. Alaska Evidence Rule 411, which speaks to this issue, provides:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

■ In a few of the instances where the superior court admitted the evidence regarding malpractice insurance and liability, it was for the purpose of showing that Cummings was guilty of malpractice in failing to advise Sea Lion that he had accused an associate of committing malpractice in the Air Logistics litigation. The superior court later granted Cummings' motion for a directed verdict on

---

**8.** Alaska Rule of Evidence 403 provides:
· Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

the issue of whether he failed to inform Sea Lion of his colleague's previous malpractice. However, the superior court also instructed the jury that it could consider evidence introduced in support of that claim when considering the other claims that Sea Lion was still pursuing. Assuming this instruction embodied an incorrect statement of law, we hold that any error in admitting this evidence was rendered harmless in light of the fact that the superior court further instructed the jury that it should not infer from any of the references to insurance that any of the parties did or did not have malpractice insurance.[9] Additionally, our review of the record persuades us that the admission of this evidence did not appreciably affect the jury's verdict.[10]

### B. *The Superior Court Did Not Err in Failing to Give Cummings' Proposed Jury Instructions on the Scope of the Attorney–Client Relationship.*[11]

■ The superior court gave the following instruction regarding the scope of the attorney-client relationship:

> I will now explain the professional negligence of an attorney for you. An attorney is negligent in the representation of a client if, within the scope of that attorney-client relationship, the attorney fails to use such skill, prudence, and diligence as other reputable attorneys in good standing commonly possess and would exercise under similar circumstances.[12]

■ On appeal, Cummings argues that the superior court erred in giving this instruction without also giving the instructions that Cummings had proposed. These proposed jury instructions would have defined the scope of the attorney-client relationship. However, the Alaska case that Cummings cites in support of his proposed instructions, *Jones v. Wadsworth*, 791 P.2d 1013 (Alaska 1990), does not mandate that such instructions should be given. We reject Cummings' argument. The superior court's instructions advised the jury that an attorney is negligent in the representation of a client only for actions "within the scope of that attorney-client relationship. . . ." One of the issues in the case involved which services Cummings had an obligation to provide to Sea Lion. The superior court did allow Cummings to argue to the jury his method of evaluating and defining the scope of the attorney-client relationship. Therefore, even if the superior court had given the proposed instructions, they would not have given the jury any more guidance than it already had. We hold that the superior court's refusal to give Cummings' proposed instructions was not error.

### C. *The Superior Court Correctly Refused to Grant Cummings' Motions for a Directed Verdict, Judgment Notwith-*

---

9. Cummings also cites as error testimony given by Strait, where, after the superior court instructed him not to discuss "malpractice insurance," Strait then referred to "coverage to protect against the malpractice claim." However, Cummings did not object to this during trial, and therefore that instance is not properly before us.

10. *Love v. State,* 457 P.2d 622 (Alaska 1969).

11. Jury instructions involve questions of law, which we review under the independent judgment standard. *Aviation Associates v. TEMSCO Helicopters,* 881 P.2d 1127, 1130 (Alaska 1994). The superior court's denial of a proposed jury instruction will be upheld if the instructions given, when read as a whole, adequately inform the jury of the relevant law. *See Searfus v. Northern Gas Co.,* 472 P.2d 966, 970 (Alaska 1970).

12. The remainder of the superior court's instruction on professional negligence reads as follows:
    An attorney is not necessarily negligent because he makes errors in judgment or because his efforts are unsuccessful. However, an attorney is negligent if his error in judgment or lack of success is due to his failure to possess or use such skill, prudence and diligence as other reputable attorneys in good standing commonly possess and would use under similar circumstances.
    After determining from the evidence what level of knowledge, skill and care other reputable attorneys in good standing would more likely than not have used, you must then determine whether Cummings possessed and used that level of knowledge, skill and care in his representation of Sea Lion, or whether he failed to do so and, therefore, was negligent.
    If you find that Cummings was not negligent, then you must return a verdict for him with respect to the claim of professional negligence. If you find that Cummings was negligent, then you must also decide whether Cummings' negligence was a legal cause of Sea Lion's harm. I will define legal cause for you in a moment.

*standing the Verdict, and a New Trial.*[13]

■ In its special verdict, the jury found that Cummings had committed professional malpractice[14] and fiduciary fraud[15] and that these breaches were legal causes of injury to Sea Lion. Cummings moved for a directed verdict, judgment notwithstanding the verdict, and a new trial. The superior court denied these motions. On appeal, Cummings argues that there is no evidentiary support for the jury's verdicts, and that the superior court erred in failing to grant Cummings' motions for a directed verdict, judgment notwithstanding the verdict, and a new trial.[16] For the reasons we discuss below, we hold that the superior court correctly refused to grant Cummings' motion for a directed verdict, for a new trial, and for a judgment notwithstanding the verdict.

### 1. Negligence Claim

■ The superior court instructed the jury that there were five ways in which it could find that Cummings was professionally negligent. The jury did not specify which of the five grounds was the basis for its decision, but it found in special verdicts that Cummings was professionally negligent, that his negligence was a legal cause of injury to Sea Lion, and that as a result of this negli-

gence Sea Lion suffered $650,000 in damages.

■ The first ground that Sea Lion asserted as a basis for holding Cummings liable is that he failed to "reasonably advise [Sea Lion] of his conflicts of interest and to fully disclose all facts that could materially affect Sea Lion's rights and interests." At the time that the relevant events in this case occurred, Alaska Disciplinary Rule 5–101(A) stated:

Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

While rules of professional conduct do not constitute a basis for malpractice liability in and of themselves, they are relevant to the issue of what duty an attorney owes to a client.

In the case at hand, Disciplinary Rule 5–101(A) indicates that Cummings had a duty to Sea Lion to disclose the fact that he stood to profit from the success of BTS in that the attorney's fees owed to him by Gillespie were dependent on BTS's profitability. Cum-

---

**13.** This court's role in reviewing a denial of a motion for a directed verdict and judgment notwithstanding the verdict is "to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts." *Geolar, Inc. v. Gilbert/Commonwealth, Inc.*, 874 P.2d 937, 941 n. 8 (Alaska 1994) (quoting *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982)).

"The grant or refusal of a motion for a new trial rests in the sound discretion of the superior court, and we will not disturb a trial court's decision on such a motion except in exceptional circumstances to prevent a miscarriage of justice." *Buoy v. ERA Helicopters*, 771 P.2d 439, 442 (Alaska 1989).

**14.** Professional malpractice consists of four elements:

(1) the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.

*Doe v. Hughes, Thorsness, Gantz, Powell & Brundin*, 838 P.2d 804, 806 (Alaska 1992) (citation omitted).

**15.** In *Greater Area, Inc. v. Bookman*, 657 P.2d 828, 830 (Alaska 1982), we described fiduciary fraud as follows:

The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. "Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud." (Citation omitted.)

**16.** Cummings also argues that the superior court erred in failing to grant the motions for partial summary judgment which he filed prior to trial. However, the arguments contained in Cummings' brief to this effect are cursory and Cummings fails to inform this court of what evidence was before the superior court at the time it considered these motions. Cummings' briefing on this issue is inadequate, and we therefore decline to consider it.

mings never informed Sea Lion of the fee arrangement he had with Gillespie, or divulged that he stood to profit from the success of the BTS partnership. Therefore, we conclude that there was sufficient evidence from which a reasonable jury could conclude that Cummings had a professional duty to Sea Lion and that he breached that duty.

However, that alone is not enough to impose liability for professional malpractice. There must be a causal connection between the breach and the harm suffered. *Hughes, Thorsness, Gantz, Powell & Brundin*, 838 P.2d at 806. The superior court correctly instructed the jury that Cummings could only be found liable if his professional negligence was the "legal cause" of the injury.

There was sufficient evidence in the record for a reasonable jury to conclude that Cummings' failure to fully inform Sea Lion concerning his relationship with Gillespie caused Sea Lion's harm. Specifically, in response to a question inquiring what he would have done if he "knew that Mr. Cummings was going to have some continuing relationship with Mr. Gillespie," James Joseph, Sea Lion's secretary and treasurer, testified that "I would have voted against joining [Sea Lion] into BTS." It is reasonable to infer that if Joseph had voted against the partnership interest in BTS other Sea Lion directors would have followed his lead, and that Sea Lion would not have agreed to the BTS proposal. If that had happened, Naneng would not have had the opportunity to sign the 1985 FSA that formed the basis for Sea Lion's liability to Air Log.

A finding of liability on the ground of Cummings' failure to advise of his conflict of interest and of other material facts is sufficient standing alone to support the jury's award of compensatory damages against Cummings. Consequently, it is not necessary for us to address whether there was sufficient evidence to support a finding of negligence based on the other grounds that Sea Lion asserted. We hold that the superior court did not err in refusing to grant Cummings' motions for a directed verdict, a judgment notwithstanding the verdict, or a new trial.

### 2. *Fiduciary Fraud Claim*

Cummings also argues that the superior court should have granted his motions for a directed verdict, a judgment notwithstanding the verdict, or a new trial regarding Sea Lion's claim of fiduciary fraud.

An attorney has a fiduciary relationship with his or her client. *See Greater Area*, 657 P.2d at 830. The superior court instructed the jury as follows regarding the fiduciary fraud claim:

A fiduciary is a person in whom another has placed special confidence and trust. As a fiduciary to Sea Lion, Cummings was obligated to render a full and fair disclosure to Sea Lion of all facts that materially affected Sea Lion's rights and interests. Any material concealment or misrepresentation by a fiduciary amounts to fraud.

In order for Sea Lion to win on this claim, you must decide whether Sea Lion has established that it is more likely true than not true that:

1. Cummings concealed or failed to disclose information to Sea Lion.

2. The information concealed or not disclosed was susceptible of knowledge at the time Cummings represented Sea Lion; and

3. The information concealed or not disclosed was material. *Material information is information which, if disclosed, would be reasonably expected to influence a person's judgment or conduct concerning the transaction in question; and*

4. Sea Lion actually formed and relied upon a false and misleading understanding created by Cummings' concealment or nondisclosure; and

5. Sea Lion's reliance on its false or misleading understanding was justifiable. Sea Lion's reliance on a false or misleading understanding created by a nondisclosure is justifiable even if imprudent or exhibiting poor judgment for a person of Sea Lion's background and experience unless Sea Lion's conduct in failing to discover the non-disclosure was wholly irrational, preposterous or in bad faith; and

6. As a result of Sea Lion's reliance, Sea Lion suffered some damage or injury; and

7. That when Cummings concealed or failed to disclose the material information he was aware of the information not disclosed.

There was sufficient evidence for a reasonable jury to conclude that each of these elements was satisfied. Cummings failed to fully and fairly disclose to Sea Lion that he would only be paid by Gillespie if the BTS venture was successful. This information was susceptible of ascertainment at the time Cummings represented Sea Lion. Furthermore, the concealed information was material since it is reasonable to expect that Sea Lion would have been influenced by the knowledge that its own attorney actually had a vested interest in the outcome of the BTS venture. That is, Sea Lion might have been more skeptical of Cummings' recommendation of Gillespie as a business partner. Sea Lion in fact relied on Cummings' nondisclosure, since it only transacted business with Gillespie following the introduction of Gillespie to Sea Lion and Cummings' recommendation of Gillespie. This reliance on the part of Sea Lion was justifiable, since Sea Lion had no reason to suspect Cummings' recommendations. Finally, this reliance stemming from Cummings' nondisclosure caused harm to Sea Lion, since there is evidence that, absent Sea Lion's reliance on the misleading circumstances created by Cummings' nondisclosure, Sea Lion would not have proceeded with the BTS partnership agreement, which in turn led to Sea Lion's liability to Air Log. Therefore, the superior court did not err in denying Cummings' motions regarding the fiduciary fraud claim.

D. *The Superior Court Did Not Err in Failing to Grant Cummings' Motion for a Directed Verdict on the Issue of Punitive Damages.*[17]

Sea Lion presented to the jury two independent claims against Cummings: one for professional negligence and one for fidu-ciary fraud. Sea Lion requested the jury to return an award of compensatory damages based on either one or both of these legal theories. Additionally, Sea Lion sought punitive damages against Cummings based on its claim for fiduciary fraud.

Cummings argues that the superior court erred in failing to grant his motion for a directed verdict on the issue of punitive damages.

To recover punitive damages, the plaintiff must prove that the wrongdoer's conduct was outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another. Actual malice need not be proved. Rather, [r]eckless indifference to the rights of others, and conscious action in deliberate disregard of them ... may provide the necessary state of mind to justify punitive damages. Punitive damages require proof by clear and convincing evidence.

*Barber v. National Bank,* 815 P.2d 857, 864 (Alaska 1991) (citations omitted) (alteration and omission in original). Cummings' primary argument on appeal to this court is that, because there was not sufficient evidence to support a finding that Cummings committed fiduciary fraud, punitive damages should not have been awarded. However, we have held that there was sufficient evidence to support the underlying cause of action. Cummings offers no other arguments that lead us to question the jury's finding by clear and convincing evidence that his conduct was outrageous. The superior court did not err in refusing to grant Cummings' motions regarding punitive damages.

E. *The Superior Court Did Not Err in Applying Comparative Negligence to Reduce Sea Lion's Compensatory Damages.*[18]

On December 24, 1992, Sea Lion served a Civil Rule 68 offer of judgment on

---

**17.** In reviewing a denial of a motion for a directed verdict and judgment notwithstanding the verdict we "determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment as to the facts." *Geolar,* 874 P.2d at 941 n. 8 (quoting *Mullen,* 642 P.2d at 1348).

**18.** Sea Lion's cross-appeal, which challenges the superior court's application of comparative negli-

Cummings. Sea Lion offered to allow entry of judgment in its favor and against Cummings for "$599,999 plus pre-judgment interest as allowed by law, plus costs as allowed by law, plus attorneys' fees as allowed by law." Cummings did not accept the offer.

The jury awarded Sea Lion $480,000 for the judgment paid to Air Log, $100,000 for legal fees paid to Cummings, and $70,000 for expenses in the Air Log appeal, for a total compensatory damage award of $650,000, all based on the negligence claim. The jury also awarded Sea Lion an additional $106,000 in punitive damages for a total damage award of $756,000.

The superior court offset Sea Lion's compensatory damage award by the thirty-four percent comparative fault special verdict finding which the jury had made against Sea Lion with respect to the professional negligence claim. Thereafter, the superior court awarded Sea Lion prejudgment interest at the rate of 10.5 percent and Civil Rule 82 attorney's fees based upon the lower compensatory damage and prejudgment interest figures.

On cross-appeal, Sea Lion argues that the superior court erred in applying comparative negligence to reduce Sea Lion's compensatory damages, and in awarding interest and attorney's fees based on the reduced damages. Sea Lion claims that the jury found "that Cummings committed intentional and outrageous fiduciary fraud which was a legal cause of Sea Lion's damage." In Alaska, an award based upon intentional misconduct is not reduced by a showing of comparative negligence on the part of the plaintiff. AS 09.17.900;[19] *see also Borg–Warner Corp. v. Avco Corp.*, 850 P.2d 628, 633 n. 14 (Alaska 1993). Sea Lion argues that the

compensatory damage award should not have been reduced, the prejudgment interest rate should have been calculated at 15.5 percent, and attorney's fees should have been calculated based on Sea Lion's full compensatory damages and prejudgment interest at the rate of 15.5 percent.

In this case, the jury was not instructed to determine whether Cummings' professional negligence was based on intentional conduct. The court's comparative negligence instructions and special verdict forms demonstrate that Sea Lion's comparative negligence reduced the damages which Cummings' nonintentional professional negligence caused Sea Lion. Given the structure of the superior court's special verdict form, it is apparent that Cummings' intentional breach of his fiduciary duties to Sea Lion provided the foundation for only the jury's award of punitive damages. Therefore, there is no reason to modify the superior court's order that reduced the jury's awards based on Sea Lion's comparative negligence.

## IV. CONCLUSION

For the above reasons, we AFFIRM the judgment of the superior court.

---

gence to reduce Sea Lion's compensatory damages, raises a question of law. When reviewing a question of law we are not bound by the lower court's holding but instead apply our independent judgment. *Summers v. Hagen*, 852 P.2d 1165, 1169 (Alaska 1993). When reviewing questions of law our duty is to adopt the rule of law which is most persuasive in light of precedent, policy, and reason. *Id.*

**19.** Alaska Statute 09.17.900 provides as follows: In this chapter "fault" includes acts or omissions that are in any measure negligent or

reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.