**Antone NELSON, Appellant/Cross–Appellee,**

v.

**PROGRESSIVE CORP., and/or Progressive Companies and/or Progressive Preferred Insured Company, Appellees/Cross–Appellants.**

Nos. S–7695, S–7725.

Supreme Court of Alaska.

March 26, 1999.

---

**3.** *See supra* pp. 853–855 and note 2.

Peter Gruenstein, Patricia A. Vecera, Gruenstein, Hickey & Stewart, Anchorage, for Appellant/Cross–Appellee.

Gary A. Zipkin, Susan M. West, Guess & Rudd, Anchorage, for Appellees/Cross–Appellants.

Before: MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

## I. INTRODUCTION

This appeal arises from a disputed claim on uninsured motorist coverage issued to Antone Nelson by his insurer, Progressive. Nelson was awarded the policy limits at arbitration. In the subsequent bad faith lawsuit, the jury found that Progressive engaged in knowing misrepresentation and awarded compensatory damages, but did not find that Progressive acted in bad faith or that punitive damages were warranted. Nelson raises various claims of error in his bid for a new trial. We affirm because Nelson has waived his right to challenge any inconsistency in the jury's verdict, because the jury's punitive damages finding was not plainly unreasonable, and because we find that the trial court did not abuse its discretion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

In July 1993 Antone Nelson's left knee was injured when a vehicle driven by an intoxicated motorist collided with Nelson's vehicle at an Anchorage intersection. The intoxicated motorist was uninsured, but Nelson had a policy with Progressive which included uninsured motorist coverage of $100,000 and medical payments coverage of $10,000.

Nelson's claim under his Progressive policy was assigned to adjuster Timothy Intfen. Intfen investigated the claim by requesting damage information from Nelson's present and past treating physicians and his employer. During his investigation, Intfen learned that Nelson had torn his left anterior cruciate ligament (ACL) in a motocross accident in 1984. This injury had required reconstructive surgery.

For more than three months following the collision, Nelson was unable to work. He was seen by two physicians, and engaged in physical therapy. In November 1993 Progressive offered to settle Nelson's uninsured motorist claim for $10,000. Nelson rejected the offer, but did not state a counter-offer. In February 1994 Nelson's knee specialist advised Nelson that he had reached a plateau, and would either have to learn to live with discomfort or have arthroscopic surgery. In March 1994 Nelson informed Progressive that his physician was recommending surgery, and made a settlement offer of $70,000. Progressive counter-offered $18,000, which Nelson rejected, and the parties made little progress toward settlement.

In May 1994 Progressive retained the Stealth Group for surveillance of Nelson's activities, and Comprehensive Medical Review for a review of Nelson's medical records. The Stealth Group documented Nelson's activities over the course of three days in May, and provided Progressive with a seven-page report and videotape. A doctor with the Medical Review company, Dr. Curran, "recommend[ed] that the care Mr. Nelson has received for his left ACL problems, including any future surgery, should be apportioned entirely (100%) to the pre-existing condition of this ligament."

In June 1994 Nelson offered to accept $119,377.50 to settle his claim. Relying upon and providing Nelson with Dr. Curran's medical report, Progressive responded by reiterating its offer of approximately $18,000. Nelson maintained that "the conclusions of the non-examining physician cannot be valid[,]" and repeated his last settlement offer. As the parties had reached an impasse, Progressive invoked the arbitration clause in the policy. Progressive provided Nelson with a copy of what it stated was his complete file.

Both Progressive and Nelson retained counsel for the arbitration. Progressive's counsel instructed the Stealth Group to prepare a condensed version of the surveillance videotape for the arbitration hearing. After viewing the condensed videotape at the hearing, Nelson and his attorney realized that the videotape previously produced to Nelson was incomplete, because certain scenes on the condensed tape did not appear on the tape that Progressive had disclosed earlier.

At arbitration, Nelson was awarded $195,000 plus prejudgment interest. Progressive subsequently paid Nelson's policy limits.

### B. *Procedural Background*

Based on events taking place during the claims settlement process, Nelson filed a bad faith lawsuit against Progressive, seeking both compensatory and punitive damages. A jury trial began before Judge Joan Woodward on February 27, 1996, and lasted approximately three weeks. The jury awarded compensatory damages of $48,000 on Nelson's misrepresentation claim, but that amount was later reduced to $30,134.60 on an unopposed motion for remittitur. The jury found that Progressive did not act in bad faith, and that punitive damages were not warranted. The trial court held that Progressive was the prevailing party for the purpose of Civil Rule 82 attorney's fees. The court awarded Progressive a total judgment of $80,971.37, calculated by offsetting Nelson's judgment of $30,134.60, plus $3,796.04 in prejudgment interest from Progressive's costs of $44,902.01, and attorney's fees in the amount of $70,000.

Nelson now appeals, and Progressive cross-appeals in the event of remand for a new trial.

## III. *DISCUSSION*

### A. *The Trial Court Did Not Abuse Its Discretion in Denying Nelson a New Trial.*

After the jury returned its special verdicts finding that Progressive engaged in knowing misrepresentation but not bad faith, and awarding Nelson $48,000 in compensatory damages but not awarding punitive damages, Nelson orally moved for judgment notwithstanding the verdict (jnov) before the jury was discharged. Nelson argued that a reasonable jury could not have found that punitive damages were not justified on the evidence presented. The superior court denied the motion. The court reasoned that a reasonable jury could have concluded that punitive damages had not been proved by clear and convincing evidence, but nevertheless awarded compensatory damages under a preponderance of the evidence standard.

After the jury was excused, Nelson moved for a new trial, arguing for the first time that the special verdicts on bad faith and knowing misrepresentation were inconsistent. The superior court denied the motion on two grounds. First, it held that Nelson had waived his argument of inconsistent verdicts by failing to challenge any alleged inconsistency before the jury was discharged. And second, the court held that reasonable jurors could disagree as to whether Nelson had proved entitlement to punitive damages by clear and convincing evidence.

On appeal, Nelson argues that the trial court abused its discretion in denying a new trial.[1] Nelson argues that the special verdicts on intentional misrepresentation and bad faith are inconsistent. Nelson alternatively contends that the jury's decision not to award punitive damages was against the weight of the evidence.

### 1. *Nelson waived his right to challenge any inconsistency in the jury's verdict.*

■ Nelson argues that he did not waive his right to challenge the inconsistency of the special verdict. The superior court applied the "waiver rule" first expressed in *City of Homer v. Land's End Marine*.[2] Under this rule, a litigant waives his right to challenge the consistency of a jury's verdict if he fails to raise the issue and move for resubmission prior to the jury's discharge.[3] The reasons for the rule are to promote the efficient operation of the courts and to prevent jury-

---

**1.** The decision to grant or deny a new trial is within the trial court's discretion. If there is an evidentiary basis for the jury's decision, the denial of a new trial must be affirmed. However, if the evidence supporting the verdict was completely lacking or so slight and unconvincing as to make the verdict plainly unreasonable and unjust, we must reverse the denial of the motion for a new trial. In reviewing such denials, we must view the evidence in the light most favorable to the non-moving party.

*Hayes v. Xerox Corp.*, 718 P.2d 929, 933 (Alaska 1986).

**2.** 459 P.2d 475 (Alaska 1969).

**3.** *See id.* at 480.

shopping by litigants, who would otherwise be able to choose between moving for resubmission to the same jury or, by remaining silent, seeking a new trial before a new jury.[4] The waiver rule has been consistently followed by this court.[5] Nelson failed to raise the issue of verdict inconsistency before the jury was discharged and thus has waived his right to challenge the verdict on that basis.

After the jury returned its special verdict and before the jury was discharged, Nelson moved for judgment notwithstanding the verdict and asked the court to overturn the jury's verdict on the basis that no reasonable jury could have concluded that punitive damages were not warranted. Nelson's counsel stated:

> My proposal to the Court is that the—that we—the Court send the jury back with respect to question No. 6, with appropriate instructions, and—or, I'm sorry, not back with respect to question No. 6, but that enter a judgment notwithstanding the verdict on 6 and proceed to phase two. Now, recognizing that we're probably gonna have an uphill battle there if the jury is so reluctant to award monetary damages with respect to punitive damages, but it is absolutely clear from that verdict that they found conduct that ex—that well exceeds the minimum required for punitive damages, and I would submit to the Court that no reasonable jury could find otherwise in this case, based on the overwhelming evidence. And that is what, more than anything, that verdict means. They found knowing misconduct.

(Emphasis added.) Nelson did not argue that the jury's finding of knowing misrepresentation was inconsistent with its finding that Progressive did not act in bad faith. Nor did Nelson move for resubmission to the jury, requesting that the jury reconsider the

claimed inconsistency. Instead, Nelson's motion was a motion for jnov directed toward the court and asking the court to overturn the jury's verdict as a matter of law.

In conclusion on this point, Nelson neither raised an inconsistent verdict argument nor sought resubmission of the inconsistent verdicts before the jury was discharged. Nelson therefore waived his right to challenge any alleged inconsistency in the special verdicts.

2. *The jury's punitive damages finding was not plainly unreasonable and unjust.*

■ Nelson alternatively argues that the jury's decision not to award punitive damages was against the weight of the evidence, and that the trial court therefore abused its discretion in denying a new trial. "When reviewing a jury verdict under [jnov or new trial] standards, this court necessarily considers hypothetical explanations for the jury's determination. Otherwise, we would not be able to review verdicts at all." [6]

■ In order to recover punitive damages,

> the plaintiff must prove that the wrongdoer's conduct was outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another. Actual malice need not be proved. Rather, [r]eckless indifference to the rights of others, and conscious action in deliberate disregard of them ... may provide the necessary state of mind to justify punitive damages. Punitive damages require proof by clear and convincing evidence.[7]

Thus, although a plaintiff may have enough evidence to support the underlying cause of action by a preponderance of the evidence,

---

4. *See id.*

5. *See, e.g., Zok v. State,* 903 P.2d 574, 576–77 (Alaska 1995); *Blumenshine v. Baptiste,* 869 P.2d 470, 473 (Alaska 1994); *Grow v. Ruggles,* 860 P.2d 1225, 1226–27 (Alaska 1993); *Buoy v. ERA Helicopters, Inc.,* 771 P.2d 439, 442 n. 1 (Alaska 1989); *State v. Haley,* 687 P.2d 305, 321 (Alaska 1984); *City of Fairbanks v. Smith,* 525 P.2d 1095, 1097–98 (Alaska 1974); *Nordin Constr. Co. v. City of Nome,* 489 P.2d 455, 472 (Alaska 1971).

6. *Diamond v. Wagstaff,* 873 P.2d 1286, 1290 (Alaska 1994).

7. *Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1022 (Alaska 1996) quoting *Barber v. National Bank,* 815 P.2d 857, 864 (Alaska 1991) (citations omitted) (alteration and omission in original).

the plaintiff is required to further establish outrageous conduct on the part of the defendant by clear and convincing evidence before punitive damages are justified.

■ The jury's decision to refrain from awarding punitive damages even though it found knowing misrepresentation can be explained on two grounds. First, with respect to the substantive standard, even though the jury found that Progressive knowingly misrepresented some facts, it may not have found the misrepresentations sufficiently egregious to constitute outrageous conduct. "Not all conduct which amounts to [an intentional tort] is sufficiently outrageous to warrant an award of punitive damages."[8] Second, with respect to the burden of proof, although the jury found by a preponderance of the evidence that Progressive had engaged in knowing misrepresentation, the jury may not have found that Nelson had established that the acts were sufficiently outrageous by clear and convincing evidence.

We conclude therefore that the superior court did not abuse its discretion in denying Nelson's motion for a new trial.

B. *The Trial Court Did Not Abuse Its Discretion in Precluding Robert Wainscott's Rebuttal Testimony.*

■ Progressive's insurance expert George Broatch opined at trial that Nelson had "set-up" Progressive for a bad faith lawsuit. Nelson contends that he was surprised by this testimony and that the trial court should have allowed him to rebut it with his own expert witness, Robert Wainscott.[9]

Nelson did not timely disclose his rebuttal witness, however. The trial court had earlier ruled that each side must provide one day's notice of the witnesses it intended to call. At the end of the trial day on which Broatch testified, Progressive notified Nelson that it would be resting, and requested that Nelson identify any rebuttal witnesses. It was not until the next morning that Nelson gave the court and Progressive notice that he intended to call Robert Wainscott on that, the last trial day. When Progressive objected, the trial court ruled that the notice was not timely because it violated the one-day notice ruling and denied Progressive the ability to prepare effectively for cross-examination.

Nelson argues that the trial court abused its discretion in strictly enforcing its one-day notice ruling. He contends that he was surprised by Broatch's trial testimony because it conflicted with Broatch's deposition, that Progressive had a duty to give advance notice of Broatch's new testimony, and that these circumstances excused his failure to give timely notice of Wainscott's rebuttal testimony. He also argues that Progressive would not have been prejudiced by his failure to give timely notice, for the trial could have been delayed to give Progressive ample time to prepare for the cross-examination of Wainscott.[10]

■ While Nelson's excuses for not giving timely notice and argument that any prejudice to Progressive could easily have been cured would certainly have justified permitting Wainscott to testify, either immediately or after some delay, we are unable to say that the court abused its discretion by precluding his testimony. Decisions of this nature involve a complex balance of interests and objectives. The trial court must evaluate matters such as the effects of delay, the reasons offered for noncompliance with time deadlines, the importance of the testimony sought to be rebutted, the nature of the offered rebuttal, and the nature of the claimed prejudice. This process is committed to the sound discretion of the trial court. Only in rare cases where an appellate court is "left with a definite and firm conviction" that the trial court erred in striking the

8. *State Farm Mut. Auto. Ins. Co. v. Weiford,* 831 P.2d 1264, 1266 (Alaska 1992).

9. We review the trial court's rulings on the admissibility of evidence, including the testimony of expert witnesses, for an abuse of discretion. *See, e.g., Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1018 (Alaska 1996); *Spenard Action Comm. v.*

*Lot 3, Block 3, Evergreen Subdivision,* 902 P.2d 766, 780–81 (Alaska 1995).

10. Nelson expressed his willingness for the court to postpone the trial for at least a half day to enable Progressive to prepare for Wainscott's appearance.

balance reflected by its ruling is reversal warranted.[11]  This is not such a case.

### C.  *The Trial Court Did Not Abuse Its Discretion by Allowing Dr. Curran's Testimony.*

Dr. Curran is a southern California physician who provided Progressive with an expert medical opinion during the claims settlement process, and testified as an expert witness for Progressive at arbitration.  At trial, Nelson presented Dr. Curran's arbitration testimony as evidence of Progressive's bad faith with respect to the edited videotape and the allegedly fraudulent medical report.  When Progressive called Dr. Curran to testify that his opinion was only strengthened after viewing the complete and unedited surveillance videotape, Nelson objected on the ground that Dr. Curran was an expert witness, and that Progressive had failed to list Dr. Curran on its expert witness disclosures.  The trial court ruled that Dr. Curran's testimony was not expert testimony under Evidence Rule 702(a), and was not subject to prior disclosure.

Nelson makes two arguments on appeal.  First, Nelson argues that Dr. Curran's trial testimony was irrelevant to the issue of Progressive's bad faith.  Second, Nelson argues that Dr. Curran's trial testimony was expert testimony under Evidence Rule 702(a), and was thus subject to pretrial disclosure.[12]

With respect to relevancy, Nelson sought to establish that Progressive acted in bad faith by improperly influencing or procuring an expert medical opinion through the use of a strategically edited videotape.  Nelson raised the issue by introducing Dr. Curran's arbitration testimony in conjunction with the edited videotape.  The question of whether Progressive's editing of the videotape would have influenced Dr. Curran's opinion was at issue, and Dr. Curran's testi-

mony was probative on that issue.  Dr. Curran's testimony was thus relevant.

The next question is whether Dr. Curran appeared as an expert trial witness who was subject to the disclosure requirements of Civil Rule 26(a)(2), or appeared as a fact witness.  An expert witness may be called when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[13]  An expert witness is therefore defined as a witness whose testimony assists the fact finder with an issue requiring scientific, technical, or other specialized knowledge.

In this case, Dr. Curran's testimony was not probative on an issue requiring specialized medical knowledge.  Nelson's position at trial was that Progressive acted in bad faith and misrepresented the extent of Nelson's injuries by deliberately withholding unfavorable footage so as to influence Dr. Curran's medical opinion.  Progressive sought to rebut that contention by demonstrating that Dr. Curran's opinion would not have been influenced by its videotape editing.  However, we conclude that Dr. Curran's trial testimony was not intended to assist the trier of fact in understanding medical evidence relating to Nelson's injury.  Instead, Dr. Curran testified at trial as a fact witness, and offered his opinion that his earlier expert opinion would not have been different had Progressive supplied him with the unedited videotape.

The trial court did not abuse its discretion by refusing to exclude Dr. Curran's opinion testimony as a witness.  In this case, Nelson raised the issue of whether Progressive's editing would have influenced Dr. Curran's expert medical opinion.  Dr. Curran's opinion was based upon his review of both the edited and unedited videotapes, and was helpful to a determination of the improper editing issue.  The trial court's decision to permit Dr. Cur-

---

11.  *Harris v. Keys,* 948 P.2d 460, 466 (Alaska 1997).

12.  This court reviews the trial court's rulings on the admissibility of evidence for an abuse of discretion.  *See id.* n. 3.

13.  Alaska R. Evid. 702(a); *see also Spenard Action Comm.,* 902 P.2d at 780–81.

ran's testimony did not constitute an abuse of discretion.[14]

### D. The Trial Court Properly Granted a Directed Verdict on Nelson's Claim for Emotional Distress Damages.

■ The trial court granted Progressive's motion for a directed verdict on the issue of emotional distress damages. Although Nelson only pled the torts of bad faith and intentional misrepresentation in his complaint, the trial court applied the standard for the independent tort of intentional infliction of emotional distress in directing a verdict in favor of Progressive. The trial court held that plaintiffs claiming emotional distress damages are required to make a threshold showing of "severe" emotional distress. The trial court recognized that Nelson experienced "frustration, anger, [and] grief," but held that there was no evidence of severe emotional distress to warrant emotional distress damages.

■ On appeal, Nelson argues that emotional distress damages may be recovered under other intentional tort theories even if a threshold showing of severity is not made.[15]

At the outset, we note that we are not reaching the issue of whether emotional distress damages may be recovered under the tort of bad faith. Because the jury did not find Progressive liable for bad faith, the jury had no occasion to consider damages for the tort, and any erroneous ruling with respect to damages for bad faith would be harmless.[16] The jury did find Progressive liable for knowing misrepresentation, however, and the trial court's ruling restricted the damage theories available for this claim. Accordingly, our discussion is limited to the tort of intentional misrepresentation, or fraud.

Black letter law indicates that emotional distress damages are not recoverable for fraud. The Restatement limits recovery for fraud to "pecuniary loss." Restatement (Second) of Torts §§ 525, 549 (1977). A leading treatise on remedies recognizes that fraud may often be accompanied by emotional distress, but states that emotional distress damages are generally not recoverable in fraud actions:

> Fraud, deceit and negligent misrepresentation are economic torts. Although the invasion of an economic interest by tort or contract breach will often cause the plaintiff personal distress, the interest ordinarily protected in such cases is purely an economic interest and does not include interests in personality. Accordingly, the usual rule is that the plaintiff must show pecuniary loss in misrepresentation cases and the damages are limited to such pecuniary loss, with no recovery for emotional distress.[17]

A wide divergence of authority nevertheless exists among the courts on this issue. Of the jurisdictions specifically addressing the issue and not allowing recovery, the usual rationale is that fraud is an economic tort rather than a dignitary tort, that fraud protects interests more akin to a contract claim than a tort claim, and that emotional distress damages are thus inappropriate.[18]

---

14. See *Miller v. Phillips*, 959 P.2d 1247, 1249–51 (Alaska 1998).

15. The appropriate standard for recovery of emotional distress damages involves a question of law which this court reviews de novo. See *Jones v. Jones*, 942 P.2d 1133, 1135–36 (Alaska 1997). We adopt the rule of law that is most persuasive in light of precedent, reason, and policy. See *id.*

In reviewing motions for a directed verdict, this court views the evidence "in the light most favorable to the non-moving party" and determines whether "reasonable minds could not differ in their judgment." *Chizmar v. Mackie*, 896 P.2d 196, 200 (Alaska 1995) (quoting *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (internal citations omitted)). This court does not "weigh conflict-ing evidence or judge the credibility of witnesses if there is room for diversity of opinion among reasonable people, the question is one for the jury." *Id.*

16. See *Baker v. Werner*, 654 P.2d 263, 267 n. 6 (Alaska 1982).

17. Dan B. Dobbs, *Law of Remedies* § 9.2(4), at 559–60 (2d ed.1993).

18. See *Cornell v. Wunschel*, 408 N.W.2d 369, 382 (Iowa 1987). See also *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Maine 1987); *Turner v. General Adjustment Bureau, Inc.*, 832 P.2d 62, 67–69 (Utah App.1992) cert. denied sub nom. *Turner v. Norton*, 843 P.2d 1042 (Utah 1992). See generally Steven J. Gaynor, Annotation, *Fraud Actions:*

On the other hand, some commentators have surveyed the legal support for emotional distress damages and advocated policy arguments for widespread acceptance by the courts.[19] Many jurisdictions have allowed plaintiffs to recover emotional distress damages in fraud actions.[20] These courts focus on the moral culpability of the defendant, view fraud within the broader framework of intentional torts, and regard fraud as protecting both economic and dignitary interests.[21]

Of the courts allowing recovery, many have adopted hybrid approaches which allow recovery for emotional distress in fraud actions under some circumstances. They impose additional requirements that the plaintiff must satisfy before recovery is allowed. Examples include limiting recovery to severe emotional distress,[22] requiring that the tortious conduct be committed in a wanton or malicious manner,[23] requiring that bodily illness or injury be highly foreseeable,[24] and allowing emotional distress damages as part of exemplary or punitive damages.[25]

We believe that the best approach is to permit emotional distress damages under a fraud theory only when such damages are severe. It would be anomalous to relax the severity requirement in economic torts where emotional distress is an unintended by-product of the wrong, while maintaining it in intentional infliction of emotional distress cases where such emotional distress is the only element of damage. Imposing a threshold severity requirement is thus consistent with our case law and the trial court did not err in so ruling.

The next question, then, is whether the trial court properly directed a verdict against Nelson because it found the evidence did not rise to the level of "severe" emotional distress.

Nelson submitted some evidence of emotional distress at trial. He testified that his dealings with Progressive made him "aggravat[ed]," "angry," "upset," and "red in the face." Nelson also testified that he felt as if he was being "leverage[d]" by Progressive in its handling of his claim. Nelson's father testified that Nelson was "emotionally different" after the accident, was increasingly bothered that the claim was not settled, and was exhibiting a great deal of anger and anguish over Progressive's handling of his claim. Moreover, Nelson read aloud letters that he had written to Progressive two years prior to trial in which he had stated that Progressive's actions were causing him "emotional distress and mental anguish."

Although Nelson presented sufficient evidence for reasonable people to conclude that he suffered mental distress, we agree with the trial court that no reasonable jury could make the requisite finding of severity. The level of aggravation and frustration testified to is not, in our judgment, arguably severe.

E. *Any Error Committed by the Trial Court in Excluding Parent and Co-Subsidiary Corporations as Defendants Was Harmless.*

The trial court granted summary judgment in favor of Progressive Preferred Insurance Company (PPIC), the corporation issuing

*Right to Recover for Mental or Emotional Distress,* 11 A.L.R. 5th 88, 113–17 (1993).

19. See Andrew L. Merritt, *Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society,* 42 Vand. L.Rev. 1 (1989) (hereinafter Merritt, *Damages for Emotional Distress* ).

20. See, e.g., *Kilduff v. Adams, Inc.,* 219 Conn. 314, 593 A.2d 478, 484–85 (1991); *Nord v. Shoreline Sav. Ass'n,* 116 Wash.2d 477, 805 P.2d 800, 803–05 (1991). See generally Annotation, 11 A.L.R. 5th at 103–13.

21. See Merritt, *Damages for Emotional Distress supra,* at 6.

22. See, e.g., *McGregor v. Mommer,* 220 Mont. 98, 714 P.2d 536, 545 (1986); *Roberts v. U.S. Home Corp.,* 694 S.W.2d 129, 136 (Tex.App.1985).

23. See, e.g., *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247, 1259 (1983); *Crowley v. Global Realty, Inc.,* 124 N.H. 814, 474 A.2d 1056, 1058 (1984).

24. See, e.g., *Kilduff,* 593 A.2d at 485.

25. E.g., *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50, 55 (1980). See generally Merritt, *Damages for Emotional Distress supra,* at 7–15; Annotation, 11 A.L.R. 5th at 103–13.

Nelson's insurance policy, on the issue of whether The Progressive Corporation (TPC), the parent corporation of PPIC, and "The Progressive Companies," a non-entity and popular trade name for the corporations in the Progressive family, were directly liable to Nelson. The trial court denied Nelson's motion for reconsideration as well. The trial court also denied Nelson's motion for leave to amend his complaint on the eve of trial so as to add TPC and Progressive Casualty Insurance Company (PCIC), the subsidiary of TPC responsible for adjusting claims, as defendants under newly-articulated alter-ego, instrumentality, or piercing-the-corporate-veil theories. On appeal, Nelson argues that the superior court erroneously dismissed TPC as a defendant at summary judgment, and erroneously denied Nelson's motion to amend his complaint to add TPC and PCIC as defendants.

Even assuming that the trial court may have erred on this related issue, any error would be harmless under Civil Rule 61. It is difficult to discern any effect that the presence of TPC and PCIC would have had on the issues of liability, the amount of compensatory damages, or liability for punitive damages. Nelson would have presented the same evidence and tried the same claims at trial, but with three Progressive defendants instead of one. Nelson's attempts to include the parent and a co-subsidiary of PPIC were perhaps efforts to portray the wealth available to the defendant in higher figures and thus possibly increase the amount of any punitive damages award.[26] But the jury did not find outrageous conduct warranting punitive damages. Accordingly it did not have cause to consider the size of any punitive damages award. The trial court's ruling on this issue therefore was harmless as it did not "affect the substantial rights" of Nelson.[27]

## IV. CONCLUSION

The judgment entered below is AFFIRMED.[28]

---

26. *See, e.g., Lundquist v. Lundquist,* 923 P.2d 42, 50 n. 8 (Alaska 1996) (among other factors, this court looks to the wealth of the defendant in determining whether a punitive damages award is excessive).

27. *See* Alaska R. Civ. P. 61.

28. Although Nelson argued in his briefs that the trial court erroneously awarded attorney's fees to Progressive under Civil Rule 82, we have no cause to address that argument here because Nelson subsequently withdrew the issue after oral argument. Nor do we address Progressive's cross-appeal since it was contingent on our remanding for a new trial.