Terry A. CARTEE, Appellant,

v.

Catherine M. CARTEE, Appellee.

No. S–13319.

Supreme Court of Alaska.

Sept. 24, 2010.

Mary A. Gilson and Allison E. Mendel, Mendel & Associates, Anchorage, for Appellant.

Sarah J. Tugman, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

## OPINION

CARPENETI, Chief Justice.

## I. INTRODUCTION

A husband appeals the trial court's award to his former wife of 60% of the marital property. He argues that the trial court abused its discretion by improperly awarding rehabilitative alimony, and by improperly considering his non-marital assets, the parties' age difference, his daughter's future college expenses, and his spending habits during the marriage. He also challenges the

court's valuation of a marital gun collection as clear error, and challenges the court's exclusion of his expert airplane appraiser as an abuse of discretion. Because the trial court did not abuse its discretion or clearly err in its division and valuation of property, we affirm the superior court on all issues.

## II. FACTS AND PROCEEDINGS

### A. Facts

After nearly 16 years of marriage, Terry and Cathy Cartee separated on June 25, 2006. At the time of trial, Terry was in his early 60s and Cathy was about 50 years old. The parties have one child, a daughter, K.C., born in 1993.

### 1. The parties' conduct, contributions, and financial arrangements during the marriage

During the marriage, Terry worked a week-on/week-off schedule as an electrician on the North Slope. He spent a few days of each off-week flying for the National Guard and he guided hunting trips a few times a year. Also during the marriage, Terry earned a hunting guide license and an EMT license, worked on a pilot instructor's license, trained for the fire brigade, and otherwise pursued opportunities for career advancement. The year after the parties separated, Terry earned approximately $166,000.

Before the marriage, Cathy had earned a nursing degree and during the marriage she worked part-time as a nurse. Cathy also bore sole responsibility throughout the entire marriage, and particularly during Terry's long absences, for taking care of the home and taking care of K.C. Because of her childcare and housekeeping responsibilities, Cathy was unable to work full time. Also as a result of her domestic responsibilities, Cathy forwent the opportunity to accept promotions, complete additional education, or otherwise advance her career during the marriage. At trial Cathy testified that she would have liked to pursue an advanced nursing degree during the marriage, but that her work schedule and her responsibilities of

caring for K.C. made this impossible. Cathy testified that she is still interested in earning the degree, which would significantly increase her earning capacity. After the separation, Cathy went to work full time. She currently earns approximately $38 an hour.

During the marriage, all of Cathy's nursing income went to pay for her own and K.C.'s expenses, including food, clothes, and medical bills. Terry paid the mortgage and utility bills for the family home from his earnings, but much of his income was spent on his personal interests and hobbies, including buying guns, buying hunting and camping gear, and refurbishing his personal airplane.

Terry has significant non-marital assets including the premarital portion of his retirement accounts and a valuable piece of land. Cathy came into the marriage with little other than an encumbered vehicle and a small savings account.

### 2. The marital guns

Terry and Cathy's marital property includes a substantial gun collection. Terry submitted at least four different firearm inventories at various points in the litigation: in his initial disclosures, on a handwritten list generated by him at an unknown time and for an unknown purpose, on his July 2008 property spreadsheet, and on the August 2008 spreadsheet provided with his trial brief. The values he gave for the same guns across different lists varied widely [1] and some lists included guns that did not appear elsewhere. Terry testified that, other than a few missing items that he identified, the August 2008 spreadsheet was accurate as to the number of guns and their values. He did not offer an appraisal. Cathy did not cross-examine Terry's testimony as to the gun values, but she did testify that during the marriage Terry secretly purchased several firearms.

### 3. The marital airplane

The marital property also includes a small airplane. Cathy's expert witness Keenen

---

1. For example, the value of a Robar appeared on Terry's handwritten list as $6,000, in his initial disclosures as $5,600, and on his August 2008 spreadsheet as $2,800.

Zerkel, a certified appraiser, testified that the plane was worth $162,979 and Terry did not cross-examine him. Thereafter, Terry sought to introduce Dan Hollingsworth, owner of an airplane repair business, as a "rebuttal witness." The trial court ruled that Hollingsworth could not give an expert opinion as to the airplane's value because Terry had failed to provide an appraiser's report in compliance with the trial calendar order. The court did permit Hollingsworth, who was personally familiar with the plane, to testify as a fact witness about the plane's components.

### B. Proceedings

Trial was held on August 12–13, 2008, regarding child custody and property division. The court issued detailed oral findings at the conclusion of trial and subsequently issued written findings of fact and conclusions of law. The court denied motions for reconsideration by both Cathy and Terry.

### 1. Equitable division of marital property

The trial court awarded Cathy 60% of the marital property.[2] The trial court made no finding as to the net value of the marital estate, but using Terry's estimate of $1,131,681, the difference to Terry between a 50% allocation and the 40% he received is approximately $113,000.

Among its several bases for the property division, the trial court found that under the circumstances, Cathy was "entitled to an equivalent of rehabilitation alimony that comes in the form of an uneven division of property." That way, the court said "she could reasonably contemplate taking some time off and going full time to school if that were something that interested her." In its order denying reconsideration, the court explained that

> [t]he evidence established that Cathy bore the burden of daily child rearing, with pitifully few exceptions. This necessarily retarded her career development as a nurse. . . . At one point she had to decline a promotion to a supervisory position because of [K.C.]. This role division permit-

ted Terry to develop ancillary aviation and guiding skills. As a practical matter Cathy was too tied up . . . to get the masters degree in nursing to which she still aspires, and which would materially increase her earning capacity. The extra resource allocated to her by the court will give her the opportunity to take two years out of the work force to obtain that degree.

The court cited two additional justifications for the unequal division. First, Terry, unlike Cathy, "has very substantial non-marital assets" and is therefore better equipped to deal with the effects of an unequal property division. Second, because of Terry's higher earning capacity, he could readily compensate for the unequal division by increased savings over his remaining work life, or by working an additional year beyond his planned retirement. In addition, the court observed that K.C. "must look to her mother as the only 100% reliable underwriter of a future college expense," a circumstance that the court noted was "merely illustrative of Cathy's situation, [and not] an independent basis for an unequal property division." Finally, the court clarified that although it was aware Terry had spent "wildly over his marital portion of their resources and assets of the marriage for his personal consumption and use," its unequal property division was not, and could not properly have been, founded on this fact or crafted to penalize Terry on this basis.

### 2. Valuation of marital gun collection

The trial court valued the marital gun collection at $24,125, saying it arrived at this figure by selecting the largest value for each gun that it found among the multiple inventories submitted by Terry. In its order denying reconsideration, the court explained that

> Terry did not explain with specificity why he valued his guns at particular amounts. He conceded that he purchased some of the guns secretively. He did not offer an appraisal. The court felt the fairest approach was to accept the highest value he

**2.** The 60/40 split was subject to one exception; the marital portion of Terry's National Guard retirement was divided 50/50 by stipulation of the parties.

had given any particular weapon on the various listings produced. . . .

### 3. Valuation of marital airplane

The trial court valued the marital airplane at $162, 979, explaining that it accepted the value testified to by Cathy's expert appraiser, Mr. Zerkel. The court said it found Zerkel to be a "credible witness and [an] accomplished ... highly credentialed appraiser" who took Terry's criticisms of the appraisal into account. In its order denying reconsideration, the court further explained that

> Terry's own appraiser was excluded from trial because he was not on the expert witness list and had not produced a report. Terry testified that ... he would not sell [the plane] at any price, effectively depriving the court of the option of simply ordering [the plane] sold and dividing the proceeds. Terry did not cogently explain how he settled at his own valuation of $120,000. The court accepted the certified appraisal rather than Terry's unsupported lay opinion.

Additional facts and proceedings relating to the trial court's exclusion of Terry's expert airplane appraiser appear below.

Terry appeals the trial court's equitable division of property on several grounds. Terry also appeals the trial court's valuation of the marital gun collection and the court's decision to exclude the expert testimony of his appraiser.

## III. STANDARD OF REVIEW

■ We review a trial court's equitable division of property between parties at divorce for abuse of discretion, and we will not disturb the result unless it is clearly unjust.[3] Whether the trial court applied the correct

legal rule in exercising this discretion is a question of law that we review de novo, using our independent judgment.[4]

■ Property valuations by the trial court are factual determinations which we will upset only if there is clear error.[5] A finding is clearly erroneous if we are "left with a definite and firm conviction on the entire record that a mistake has been made."[6]

■ A trial court's decision to admit or exclude evidence is reviewed by us for abuse of discretion, and will be upset only if we find there has been an error which affected the substantial rights of a party.[7]

## IV. DISCUSSION

### A. The Trial Court's Award To Cathy Of 60% Of The Marital Property Was Not An Abuse Of Discretion.

■ Before discussing Terry's specific objections to the court's property division, we briefly review the applicable law. Although a division of marital property should generally begin with the presumption that an equal division is equitable, a trial court has broad discretion to overcome this presumption.[8] Under AS 25.24.160(a)(4), a court may provide for an unequal division of property "in a just manner" which "fairly allocate[s] the economic effect of divorce" and is based on a consideration of the following factors (the "*Merrill* factors"[9]):

> (A) the length of the marriage and station in life of the parties during the marriage;
>
> (B) the age and health of the parties;
>
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

**3.** *Walker v. Walker,* 151 P.3d 444, 447 (Alaska 2007).

**4.** *Cox v. Cox,* 882 P.2d 909, 913 (Alaska 1994).

**5.** *Walker,* 151 P.3d at 447.

**6.** *Id.*

**7.** *Dobos v. Ingersoll,* 9 P.3d 1020, 1023 (Alaska 2000).

**8.** *Odom v. Odom,* 141 P.3d 324, 339 (Alaska 2006); *Veselsky v. Veselsky,* 113 P.3d 629, 637 (Alaska 2005).

**9.** AS 25.24.160(a)(4) codifies and expands the factors articulated in *Merrill v. Merrill,* 368 P.2d 546, 547–48 n. 4 (Alaska 1962). *Odom,* 141 P.3d at 339.

(D) the financial condition of the parties
...;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets; ... [and]

(G) the circumstances and necessities of each party;....

In addition to these factors, a trial court may consider "any other factors it deems relevant" to dividing the property.[10] While the trial court need not make findings pertaining to each *Merrill* factor, its findings must be sufficient to indicate a factual basis for the conclusion reached.[11] Where the trial court makes these threshold findings, we generally will not reevaluate the merits of the property division.[12]

Terry appeals the trial court's equitable division of property on five separate grounds. We discuss each in turn.

1. **The trial court's award of additional property to compensate Cathy for her lower earning capacity and to enable her to pursue additional education did not constitute an award of rehabilitative alimony, and the trial court did not abuse its discretion in making the award.**

■ The trial court's property division rested in part on the court's finding that during the marriage Cathy sacrificed her career to care for the couple's child while Terry advanced his career away from home. This, the court found, entitled Cathy to "an equivalent of a rehabilitation alimony that comes in the form of an uneven division of property." This extra resource, the court said, would "give [Cathy] the opportunity to take two years out of the work force" to earn an advanced degree. Terry argues that the trial court erred because an allocation of property that considers the effect of the marriage on a spouse's earning capacity, or a spouse's interest in pursuing additional education, is really an award of rehabilitative alimony. Therefore, Terry argues, the court abused its discretion by making the award without making the specific findings required for rehabilitative alimony under *Tybus v. Holland*.[13] Because we conclude that the trial court's property division did not constitute an award of rehabilitative alimony, we hold that the court did not err by neglecting to make the rehabilitative alimony findings.

■ Equitable divisions of property and awards of alimony are two of the tools available to a trial court in meeting the needs of the parties at divorce.[14] Different bodies of law govern these two mechanisms: AS 25.24.160(a)(4) identifies the factors a court must consider in making an equitable property division, while AS 25.24.160(a)(2) and the cases interpreting it articulate the findings a court must make to justify a rehabilitative alimony award. These two mechanisms require trial courts to undertake two very different analyses. A court fashioning an equitable division of property may in its broad discretion consider the parties' "earning capacity ... educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage."[15] The court may also consider "the circumstances and necessities of each party"[16] including a spouse's need for additional income while pursing a professional

**10.** *McCoy v. McCoy*, 926 P.2d 460, 463 (Alaska 1996). *See also Hooper v. Hooper*, 188 P.3d 681, 689 (Alaska 2008) (stating list enumerated in AS 25.24.160(a)(4) is "not exhaustive" and it is "entirely appropriate" for a court to consider other factors) (quoting *Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999)).

**11.** *Nicholson*, 974 P.2d at 422.

**12.** *Id.*

**13.** 989 P.2d 1281 (Alaska 1999). A trial court can award rehabilitative alimony to enable a spouse to pursue education or job training which will increase the spouse's earning capacity if such an award is "just and necessary." *Id.* at 1287. The recipient spouse must present the court with an education plan that identifies "a career goal, a degree program aimed at realizing that goal, and a time frame during which the degree may be earned through reasonable diligence." *Id.* at 1287–88 n. 26 (quoting *Myers v. Myers*, 927 P.2d 326, 328 (Alaska 1996)).

**14.** AS 25.24.160(a)(2), (4).

**15.** AS 25.24.160(a)(4)(C).

**16.** AS 25.24.160(a)(4)(G).

degree.[17] By contrast, a court's parameters for making an award of rehabilitative alimony are much narrower; under *Tybus*, the party seeking rehabilitative alimony must present a detailed "educational or job training plan so that the reviewing court can determine whether a support award is necessary and appropriate."[18] In addition, the award must be supported by a finding that the recipient spouse actually intends to use the award for that purpose.[19]

 The standards for property divisions and rehabilitative alimony awards differ because the two mechanisms serve different purposes. While a rehabilitative alimony award is made specifically to fund a spouse's job training,[20] a property division can be made for a more flexible range of reasons, including to compensate a spouse for the effect that her role in the marriage has had on her earning capacity, or to give her the option to pursue further education.[21] Because alimony awards and property divisions are guided by different principles and aimed at serving different purposes, we hold that property awards made to potentially facilitate career training are distinct from rehabilitative alimony awards, and should be analyzed by the trial court under the property division statute, and not the rehabilitative alimony standard.

 Because we conclude that the trial court did not err by awarding additional property to Cathy without making the rehabilitative alimony findings, the only remaining question is whether the trial court abused its discretion in making the property award. We hold that it did not. Abuse of discretion may occur when the trial court "considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors."[22] In this case, the trial court "fairly allocate[d] the economic effect of divorce"[23] by fashioning a property division that would either allow Cathy to support herself while maintaining her current income, or allow her to pursue an advanced degree which would increase her earning power. In explaining part of the basis for its property division, the trial court said it found that "Cathy bore the entire burden of daily child rearing" which "necessarily retarded her career development as a nurse." The court found that while this arrangement permitted Terry to develop his career skills, it meant "Cathy was too tied up, and too strapped for resources ... to get the masters degree in nursing ... which would materially increase her earning capacity." Under AS 25.24.160(a)(4)(C), these are entirely appropriate factors for a trial court to consider.[24]

Terry argues that the trial court nonetheless abused its discretion because its factual findings in support of the property division were clearly erroneous. First, Terry argues that the court clearly erred in finding that Cathy's domestic responsibilities during the marriage "necessarily" impeded her career development because it was Cathy's "choice to stay home with K.C." and "[t]here is no evidence that the parties could not have afforded child care." Terry mischaracterizes the court's finding. The court did not find that it was absolutely necessary for Cathy to stay home with K.C. or that Terry pushed Cathy into this role against her will. Rather, the court found that the role division that the couple in fact adopted—with Cathy working part-time and bearing almost all responsibili-

---

**17.** *Hooper v. Hooper*, 188 P.3d 681, 686 (Alaska 2008) (citing *Hayes v. Hayes*, 756 P.2d 298, 300 (Alaska 1988)).

**18.** *Tybus*, 989 P.2d at 1288.

**19.** *Myers v. Myers*, 927 P.2d 326, 328 (Alaska 1996).

**20.** *See Fernau v. Rowdon*, 42 P.3d 1047, 1058 (Alaska 2002) ("Rehabilitative alimony is appropriate 'when the recipient spouse intends to apply the alimony toward job training designed to lead to employment.'") (quoting *Jones v. Jones*, 835 P.2d 1173, 1178–79 (Alaska 1992)).

**21.** *See* AS 25.24.160(a)(4).

**22.** *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991) (describing abuse of discretion in making child custody decision).

**23.** AS 25.24.160(a)(4).

**24.** AS 25.24.160(a)(4)(C) permits consideration of "the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences ... and custodial responsibilities during the marriage."

ty for the home and for K.C., while Terry worked and pursued his interests away from home—necessarily resulted in a situation where Cathy was left without enough time to pursue additional education. Because this finding is supported by sufficient evidence, Cathy's testimony, we hold that the court did not clearly err in this regard.

Second, Terry argues that the court clearly erred in finding that Cathy's domestic role "permitted Terry to develop ancillary [career] skills." Terry argues that because he already had substantial career skills before the marriage, Cathy's sole responsibility for domestic matters during the 16–year marriage did not actually benefit him professionally. Terry's contention is not supported by the record. Not only did Terry gain over a decade of work experience during the marriage, the record shows he also earned a hunting guide license and an EMT license, worked on a pilot instructor's license, and trained for the fire brigade. Much of this training took place away from home. From this evidence, it was not clear error for the trial court to find that Terry developed career skills during the marriage and that this was enabled, in no small part, by Cathy's role as sole caregiver to the couple's child.

Because the trial court had a sufficient and proper basis for awarding Cathy additional property in recognition of her lower earning capacity and interest in pursuing additional education, we hold that the trial court did not abuse its discretion in this regard.

### 2. The trial court did not abuse its discretion in considering Terry's non-marital assets.

The court's equitable division of property was also based in part on its finding that Terry's "significant non-marital assets"

would cushion him from the "effects of an unequal property division." Terry argues that consideration of his separate property was an abuse of discretion because "[t]he proper test to be applied by the trial court in making an unequal division of property is the reasonable needs of the parties" and "Cathy presented no specific evidence that she has unmet financial needs." Terry cites *Odom v. Odom*[25] for the proposition that the "reasonable needs" test controls an equitable division of property. However, this misstates *Odom's* holding. In *Odom*[26], we held that the trial court abused its discretion in awarding a wife $2.25 million and invading the husband's separate property in order to allow her to maintain her previously extravagant lifestyle without first considering whether an unequal division of marital property could properly balance the equities.[27] We held that *"the decision to invade separate property* may be undertaken only after the trial court has attempted to use the marital estate to balance the equities ... in light of the parties' reasonable needs."* [28]

Unlike *Odom*, this case does not involve an invasion of separate property. This case involves the equitable division of marital property, a task that must be guided by the factors listed in AS 25.24.160(a)(4).[29] One of those factors is "the financial condition of the parties." [30] Indeed, "the circumstances and necessities of each party" are also proper considerations.[31] However, the trial court has wide discretion to ascribe different weights to these factors upon hearing the evidence at trial.[32] Because the trial court's consideration of Terry's "financial condition," including his separate property, was proper under AS 25.24.160(a)(4), we hold that the trial court did not abuse its discretion in this regard.

25. 141 P.3d 324 (Alaska 2006).

26. *Id.* at 341.

27. *Id.* at 339–41.

28. *Id.* at 340 (emphasis added).

29. In other sections of his brief, Terry acknowledges that AS 25.24.150(a)(4) controls equitable division. *See also Young v. Lowery*, 221 P.3d 1006, 1014 and n. 38 (Alaska 2009) (rejecting former spouse's argument that the *Odom* "rea-

sonable needs" test applied to division of marital property).

30. AS 25.24.160(a)(4)(D).

31. AS 25.24.160(a)(4)(G).

32. *Veselsky v. Veselsky*, 113 P.3d 629, 637 (Alaska 2005); *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

### 3. The trial court's consideration of the parties' ages was not an abuse of discretion.

■ Terry argues that the trial court abused its discretion in dividing the marital property without adequately considering the age difference between the parties. Because we conclude that the trial court adequately considered the parties' age difference, we hold that the trial court did not abuse its discretion in this regard.

Terry is correct that the age of the parties is one factor that a trial court may properly consider in equitably dividing the marital estate.[33] However, a court has broad discretion to consider several factors in fashioning its property division,[34] and it need not place equal weight on every factor. In addition, while a trial court must make sufficient findings to indicate a factual basis for its conclusion, there is no requirement that it make specific findings pertaining to each element.[35] Here, the trial court was aware of the 12–year age difference between Cathy and Terry, and aware that Terry's anticipated age of retirement was approaching. In fact, the court explicitly considered this, saying that with Terry's high salary, he could "readily make up for this unequal property division by increased savings over his remaining work life, or by working one additional year beyond his planned retirement."

Nonetheless, Terry argues, it was an abuse of discretion to consider Terry's high salary and advanced age without also considering that Cathy "has many more years in the work force" in which her earning capacity might increase. However, while AS 25.24.160(a)(4)(C) explicitly permits consideration of the parties' present earning capacities, it "does not require the court to consider the party's potential future earning capacity following significant additional education."[36]

Thus, Terry's true protest seems to be not that the court failed to sufficiently consider the parties' age difference, but that the court failed to view the age difference in the light most favorable to Terry. We generally do not reevaluate the merits of a property division where the trial court has made findings sufficient to indicate its factual basis.[37] Because we conclude that the trial court did make sufficient findings with regard to the AS 25.24.160(a)(4) factors, including the age and present earning capacities of the parties, we will not upset the court's property division on that basis.

### 4. The trial court's property division was not based on an improper consideration of K.C.'s future college expenses.

■ Terry further argues that the trial court abused its discretion by improperly allocating property to Cathy to account for K.C.'s future college expenses. Terry is correct that he has no legal obligation to pay for his daughter's post-majority college expenses[38] and that the court could not indirectly compel him to do so via a property division. However, because we conclude that K.C.'s college expenses were not a basis for the trial court's property division, we hold that the court did not abuse its discretion in this regard.

In denying reconsideration of its decision to award 60% of the marital property to Cathy, the trial court said that

> [w]hile it is to be hoped that Terry will contribute to [K.C.'s] college education, he is under no obligation to do so.... [K.C.] must look to her mother as the only 100% reliable underwriter of a future college expense. The court views this circumstance as merely illustrative of Cathy's situation, but not as an independent basis for an unequal property division.

**33.** AS 25.24.160(a)(4)(B).

**34.** *Veselsky,* 113 P.3d at 637.

**35.** *Nicholson v. Wolfe,* 974 P.2d 417, 422 (Alaska 1999).

**36.** *Hooper v. Hooper,* 188 P.3d 681, 688 (Alaska 2008).

**37.** *Nicholson,* 974 P.2d at 422.

**38.** *See H.P.A. v. S.C.A.,* 704 P.2d 205, 209–10 (Alaska 1985). AS 25.24.170 limits post-majority support for educational purposes to "unmarried 18–year–old children of the marriage while they are actively pursuing a high school diploma or an equivalent level of technical or vocational training and living as dependents with a parent...."

Terry argues that despite the court's disclaimer, "it is evident that the court considered this factor...." We disagree. The trial court correctly recognized that Terry has no obligation to fund K.C.'s college education and made clear that future college expenses were not an independent basis for its property division. The court did not cite college expenses in its initial oral findings or in its written findings of fact and conclusions of law, and the court made sufficient findings to otherwise indicate a factual basis for its property division. Therefore, we take the trial court at its word that Cathy's potential responsibility for K.C.'s college expenses was not a basis for its division of property. Because the trial court did not improperly consider K.C.'s college expenses in dividing the marital property, we hold that the court did not abuse its discretion in this regard.

5. **The trial court's property division was not based on an improper consideration of Terry's spending habits during the marriage.**

█ Terry makes two different arguments with respect to the trial court's consideration of his spending habits during the marriage: first, that the court improperly considered his extravagant personal spending in awarding Cathy a larger portion of the marital property, and second that the court erred by considering his spending habits while excluding his testimony on the matter. Terry is correct that a trial court must divide the marital property without regard to fault and may not consider a party's moral or legal marital failings that do not amount to economic misconduct.[39] However, both of Terry's arguments rest on the assumption that the trial court indeed based its equitable division of property, at least in part, on Terry's spending habits during the marriage. Because we conclude that the trial court did not base its property division in any part on Terry's spending, we hold that the court did not abuse its discretion in this regard.

Terry points us to a handful of statements by the trial court to illustrate his argument. First, Terry cites the court's question (in overruling a relevance objection regarding airplane expenditures) wondering if Terry "has spent $195,800 from 1990 to 2006, might that have some tendency and reason to prove ... the nature of his conduct during the marriage ...?" However, this section of the transcript read in full shows that the court was actually asking whether Terry's conduct in making the expenditures might "be to some extent useful in ascertaining by inference conclusions about the value of the plane." Therefore, this quote cannot be viewed as illustrating the court's improper consideration of Terry's spending.

Second, Terry cites the court's observation in its oral findings that Terry "is a miser, ... what's his is his, that he's not sharing...." Again, Terry has taken the court's statement out of context. This statement was a finding of fact which the court made not with regard to the division of marital property but in support of its conclusion that a piece of land Terry purchased before the marriage had not been transmuted into marital property.[40] Terry's argument that the court should not have made this finding while denying him the opportunity to testify about the money he spent on his family misses the point that in this instance, the court's recognition of his financial philosophy actually inured to his benefit. Terry's contention that the court found these facts "determinative in making the unequal division" is unsupported by the record.

Terry's third example has some degree of merit. He cites the court's written findings of fact and conclusions of law that "[t]he property division shall be 60/40 in Ms. Cartee's favor.... Mr. Cartee spent wildly over his marital portion of the resources and assets of the marriage for his personal consumption and use." This statement is problematic to the extent that it was a basis for

---

**39.** *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997). Cathy acknowledged that she was not alleging financial misconduct of the sort that would merit recompense via uneven property distribution.

**40.** The court explained that although Cathy did yard work on this land during the marriage, Terry's fierce "what's mine is mine" attitude indicated overwhelmingly that Terry lacked the donative intent necessary to transmute his separate property into marital property.

the court's unequal property division. However, we conclude that the court's clarification of its basis for the division, set forth in the court's subsequent orders denying Cathy and Terry's motions for reconsideration, alleviates the troubling effect of the court's initial statement.

In its order denying Cathy's motion for reconsideration,[41] the court demonstrated that it was well aware of the applicable law; it said "a court is not entitled to consider moral or legal misconduct . . . as entitling the other spouse to an enhanced portion of the marital estate" and "[j]udicial value judgments concerning discretionary spending during a marriage are generally to be avoided." In its order denying Terry's motion for reconsideration, the court put to rest any lingering questions about the basis for its property division:

> Terry is quite correct that the court cannot penalize him because he consumed markedly more of marital income than Cathy. As the court made clear in denying Cathy reconsideration of the denial of transmutation of the residential lot, she must live with her election to remain married to a freewheeling spender. But the court may properly consider the huge present disparity in income, the availability of retraining to modestly redress that imbalance, the retarding effect the marriage had on her career development, and the significant non-marital assets which cushion this gentleman from the effects of an unequal property division.

Terry has not presented us with any evidence to doubt the trial court's reasoning. Because we conclude that the trial court did not base its property division on an improper consideration of Terry's spending habits during the marriage, we hold that the trial court did not abuse its discretion in this regard.

In sum, because we find that the trial court had a sufficient and proper basis for its decision, we affirm in full the trial court's division of marital property.

## B. The Trial Court's Valuation Of The Marital Guns Was Not Clearly Erroneous.

■ Terry argues that the trial court erred in its valuation of the marital gun collection. A trial court's valuation of property when dividing marital assets is a factual determination and will be reversed only if it is clearly erroneous.[42] A finding is clearly erroneous if a review of the record leaves us with a definite and firm conviction that a mistake has been made.[43] Because we conclude that the trial court's valuation of the marital guns was supported by sufficient evidence, and indeed based on valuations submitted by Terry himself, we hold that the trial court's valuation was not clear error.

During the litigation, Terry submitted at least four different gun lists. The values given for particular guns varied widely from one list to another.[44] Terry offered no formal appraisal, but testified that he considered the most recently submitted list (the "August 2008 list") to be accurate. The trial court said it ultimately arrived at its valuation by selecting the highest value it found for each gun from among Terry's multiple lists.

■ First, Terry argues that the court clearly erred because it made insufficient findings to justify its reliance on the earlier lists over the more recent August 2008 list. Terry correctly points out that under *Ogard v. Ogard*,[45] the valuation of an asset should reflect its value as of the time of trial, and that when the court chooses an earlier valuation date, such as the date of the parties' separation, it should make a specific finding

---

41. Cathy's motion for reconsideration regarded the court's finding that a piece of land purchased by Terry before the marriage remained his separate property, and did not relate to the equitable division of marital property. However, we find it helpful in determining how the court considered evidence of Terry's spending habits.

42. *Jones v. Jones*, 835 P.2d 1173, 1175 (Alaska 1992).

43. *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 347 (Alaska 1982).

44. *See supra* note 1.

45. 808 P.2d 815 (Alaska 1991).

as to why the earlier date is more appropriate.[46] If the court in this case had valued the guns as of an earlier date and ignored evidence that the guns had increased or decreased in value by the time of trial, we agree that this would have been error under *Ogard.* However, Terry has presented no evidence that this occurred. Terry produced no evidence at trial that the changes in value from one list to another were related to appreciation or depreciation over time. Rather, Terry's argument rests on a conflation of the date on which a document was submitted to the court with the date as of which an asset was valued. Because Terry points to no evidence showing that the court used an improperly early valuation date, we find no clear error in this respect.

Second, Terry argues that the court clearly erred because, even if the court's valuation date was not improperly early, its conclusion still lacked a sufficient evidentiary basis. Terry is correct that a trial court cannot pull values out of thin air, but must have an evidentiary basis to support its findings.[47] Terry argues that the court's valuation was clear error because it "is not supported by testimony or appraisals," because there is "no testimony or appraisal contradicting Terry's trial testimony," and because "[t]he court rejected [Terry's] sworn testimony of the gun values." That much is true; but it is not true that the court had no evidentiary basis for its valuation. As the court explained, it valued the guns by selecting from among the values on the lists submitted by Terry himself. Terry's first three lists, submitted at different phases of

discovery, do constitute evidence that the court may properly consider.[48] Terry's testimony of course also constitutes properly considered evidence, but the evidentiary weight to be given to an owner's opinion testimony as to the value of his property falls squarely within the trial court's discretion.[49]

The court explained that it gave little weight to Terry's testimony on the matter because "Terry did not explain with specificity why he valued his guns at particular, amounts" and "[h]e did not offer an appraisal." In addition, the court heard evidence that gun collecting was Terry's personal interest, not Cathy's, and that Terry was secretive about his gun purchases during the marriage. From this evidence a court could infer that Terry knew the gun collection would ultimately be awarded to him in the property division, giving him an incentive in testifying to adjust his valuations downward. Faced with conflicting evidence, and absent an explanation from the person best suited to provide one, we hold that the trial court did not clearly err in choosing to value the guns based on Terry's discovery responses rather than his testimony at trial.

## C. The Trial Court's Decision To Exclude The Expert Testimony Of Terry's Airplane Appraiser Was Not An Abuse Of Discretion.

At trial the court excluded the testimony of Dan Hollingsworth, Terry's expert airplane appraiser, because Terry, in violation of the trial calendar order, had failed to produce Hollingsworth's appraisal report.[50] Terry argues that the court's decision to

**46.** *See Ogard,* 808 P.2d at 819–20.

**47.** *See Matson v. Lewis,* 755 P.2d 1126, 1129 (Alaska 1988).

**48.** *See* Alaska R. of Evid. 801(d)(2). We have previously found no error where the trial court valued an asset at the amount provided in a party's response to an interrogatory. *Davila v. Davila,* 876 P.2d 1089, 1092 (Alaska 1994).

**49.** *See Schymanski v. Conventz,* 674 P.2d 281, 286 (Alaska 1983) (holding that weight to be given to owner's testimony as to value of real property falls within trial court's discretion).

**50.** The court ruled on this objection twice during trial and both times based its decision to exclude the testimony on Terry's failure to timely provide

an appraisal report. In its order denying reconsideration of the airplane value, the court inaccurately recalled that it excluded the testimony both because of Terry's failure to provide appraisal reports and his failure to identify Hollingsworth as an expert on the witness list. Our decision rests only on the appraisal report requirement, as it was the only basis for exclusion cited by the court at the time of the ruling. Additionally, even assuming it would have been error to exclude Hollingsworth's testimony for failure to identify him as an expert witness, the result would not change as we still conclude it was within the court's discretion to exclude him for failure to provide a report.

exclude Hollingsworth's expert testimony was an abuse of discretion which affected his substantial rights, and urges us to remand for a revaluation of the plane. Because we conclude that the trial court's decision was not an abuse of discretion, we will not upset the trial court's valuation.

### 1. Additional facts and proceedings about the airplane expert issue

In March 2008 the court issued a trial calendar order which provided in part that "[a]ppraisals/brokers opinions are to be completed and exchanged thirty days prior to trial." Cathy commissioned an appraisal of the airplane from Zerkel. Terry did not submit a plane appraisal report. At trial, Cathy called Zerkel to testify about his appraisal and Terry did not cross-examine him. Later, during his case-in-chief, Terry called Hollingsworth to give his expert opinion of the plane's value. Cathy objected on the basis that Terry had never provided an appraisal report from Hollingsworth. The court ruled that Hollingsworth could not testify as an expert, explaining that the "trial calendaring order says appraisals . . . are to be completed and exchanged thirty days prior to trial," and that Terry had not provided a sufficient reason for his non-compliance.

Although the court ruled that Hollingsworth could not offer an expert opinion as to the value of the plane, the court did allow him to testify as a lay witness as to the condition of the plane and its components.[51] Hollingsworth testified that the plane was in reality exactly as Zerkel's appraisal report had described it to be, that Zerkel's appraisal accurately reflected all modifications to the plane, and that the appraisal did not add value for any equipment that was not actually part of the plane. The court ultimately valued the plane at $162,979—the value at which Zerkel, Cathy's expert, had appraised it.

### 2. The trial court's decision to exclude Hollingsworth's expert testimony based on Terry's non-compliance with the trial calendar order was not an abuse of discretion.

Terry argues that the trial court erred in excluding Hollingsworth's testimony on the basis of Terry's non-compliance with the trial calendar order because the trial calendar order did not require disclosure of appraisal reports for rebuttal experts like Hollingsworth, and that, even if disclosure was so required, the court's failure to excuse this requirement under the circumstances was an abuse of discretion. Cathy argues that the trial calendar order did require Terry to disclose Hollingsworth's appraisal report, and that therefore the court properly excluded Hollingsworth's testimony.[52] Because we conclude that the trial calendar order did require Terry to disclose an appraisal report for Hollingsworth, and hold that the court did not abuse its discretion in refusing to excuse Terry's non-compliance, we will not upset the trial court's airplane valuation.

Alaska Rule of Civil Procedure 16(e) provides that after a final pretrial conference, the trial court shall enter an order ("trial calendar order") reciting the action taken and such order "shall control the subsequent course of the action unless modified by a subsequent order." The trial calendar order "shall be modified only to prevent manifest injustice."[53] Civil Rule 37(b)(2) provides a trial court with various sanctions it may apply when a party fails to comply with a trial calendar order, including issuing an order prohibiting the disobedient party from introducing designated matters into evidence.[54] The trial court has "broad discretion" to choose an appropriate sanction.[55]

---

51. Terry also offered his own lay opinion, valuing the plane at $120,000.

52. Because we hold that the trial calendar order required Terry to disclose the appraisal report, and because the trial court excluded the testimony on this basis, we need not reach Cathy's argument that Terry was also required to make

the disclosure under Civil Rule 26.1(b)(G) and Civil Rule 26(a)(4).

53. Alaska R. Civ. P. 16(e).

54. Alaska R. Civ. P. 37(b)(2)(B).

55. *Coffland v. Coffland,* 4 P.3d 317, 320 (Alaska 2000).

However, before making such an order, the trial court must consider:

(A) the nature of the violation, including the willfulness of the conduct and the materiality of the information that the party failed to disclose;

(B) the prejudice to the opposing party;

(C) the relationship between the information the party failed to disclose and the proposed sanction;

(D) whether a lesser sanction would adequately protect the opposing party and deter other discovery violations; and

(E) other factors deemed appropriate by the court or required by law.[56]

We review a trial court's decision to admit or exclude evidence, including expert witness testimony, for abuse of discretion[57] and will only reverse an erroneous decision if it affected the substantial rights of a party.[58]

Terry first argues that the trial calendar order did not require him to disclose Hollingsworth's appraisal report in the first place, so any sanction under Civil Rule 37 was improper. In support of this interpretation, Terry offers two pieces of evidence: the fact that the order "does not address rebuttal witnesses at all," and the fact that "as a practical matter, rebuttal reports could not be submitted under the same deadline as initial expert reports." We do not find Terry's interpretation persuasive. Although Terry is correct that the trial calendar order did not address rebuttal appraisers specifically, the order did address appraisers generally, and required that appraisers' opinions be "completed and exchanged thirty days prior to trial." This requirement was framed in general terms, and is fairly read as applying to *all* appraisers who testify to their opinions during trial. Terry's suggested interpretation sets up an untenable situation wherein a party could disclose no appraiser at the outset, but then freely introduce one at the last moment to testify that the other party's appraisal was all wrong. This is the precise type of surprise and disorder that trial calendar orders are designed to avoid.[59]

Terry argues that rebuttal reports could not be disclosed, as a practical matter, on the same deadline as initial reports. However, we agree with the trial court about when Terry should have raised that point:

[w]hen you got the appraisal, if you didn't like the value or you thought it was an incorrect analysis, you certainly could have moved ... for leave to add a late witness and given an explanation. And you quite likely would have been all right in that circumstance. But to wait until after the plaintiff's expert is on and off and gone ...
I think you would agree that can't be.

Because the trial court order is fairly and sensibly read as applying to all testifying appraisers, and because Terry waived any objection as to the timing of rebuttal disclosures by failing to raise the issue at a reasonable time, we conclude that the trial calendar order required Terry to disclose Hollingsworth's appraisal report 30 days before trial.

The next question is whether the trial court abused its discretion in excluding Hollingsworth's testimony under Civil Rule 37(b). In *Nelson v. Progressive Corp.*,[60] we explained that decisions to exclude evidence under this rule

involve a complex balance of interests and objectives. The trial court must evaluate matters such as the effects of delay, the reasons offered for noncompliance with time deadlines, the importance of the testimony sought to be rebutted, the nature of the offered rebuttal, and the nature of the claimed prejudice. This process is committed to the sound discretion of the trial court. Only in rare cases where an appel-

---

**56.** Alaska R. Civ. P. 37(b)(3).

**57.** *Nelson v. Progressive Corp.*, 976 P.2d 859, 865 n. 9 (Alaska 1999) (applying abuse of discretion standard to trial court's exclusion of testimony where party violated court order by failing to give timely notice).

**58.** *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000) (citing Alaska R. Civ. P. 61).

**59.** *See, e.g., Yukon Equip. Inc. v. Gordon*, 660 P.2d 428, 432 (Alaska 1983), *overruled on other grounds by Williford v. L.J. Carr Invs., Inc.*, 783 P.2d 235 (Alaska 1989).

**60.** 976 P.2d at 859.

late court is 'left with a definite and firm conviction' that the trial court erred in striking the balance reflected by its ruling is reversal warranted.[61]

The record does not leave us with a " 'definite and firm conviction' that the trial court erred." [62] Before making its final ruling, the court heard substantial oral argument from both sides. The court made detailed findings to support its decision: that Terry could have easily avoided the delay in receiving Zerkel's worksheets, that the worksheets revealed no significant new information, that Terry would not be highly prejudiced by the exclusion, and that Cathy would be highly prejudiced if the testimony were permitted. In addition, the court minimized the prejudicial impact of its decision on Terry by crafting its ruling narrowly, permitting Hollingsworth to testify as a fact witness and critique any factual errors in Zerkel's report.[63]

The only remaining question for this court, therefore, is whether the trial court abused its discretion in refusing to modify its trial calendar order to excuse Terry from the appraisal disclosure requirement. Because we conclude that modification of the trial calendar order was not necessary to prevent "manifest injustice," [64] we hold that the trial court's decision was not an abuse of discretion.

The trial court's findings in support of its ruling demonstrate that Terry suffered no manifest injustice from the exclusion. Terry argues that he was unfairly surprised by the worksheets supporting Zerkel's report and it was unjust to deny him the opportunity to respond. However, we have held that a trial court does not abuse its discretion in finding no manifest injustice where the complaining party with due diligence could have easily avoided the complained-of surprise.[65] Here, the trial court found that Terry could easily have requested Zerkel's worksheets in dis-covery or asked for a court order at a time much earlier than the middle of trial. Because Terry is responsible for the prejudice he now complains of, we hold that the trial court did not abuse its discretion in refusing to modify its trial calendar order to excuse Terry from the appraisal disclosure requirement.

Because we hold that the trial court's decision to exclude Hollingsworth's expert testimony was not an abuse of discretion, we affirm the trial court's valuation of the marital airplane.

## V. CONCLUSION

Because the court's property division did not constitute an award of rehabilitative alimony, because the court properly considered Terry's non-marital assets and the age difference between the parties under AS 25.24.160(a)(4), and because the court did not improperly consider K.C.'s college expenses or Terry's spending habits during the marriage, we hold that the court did not abuse its discretion in awarding Cathy 60% of the marital estate. Because the court based its valuation of the marital guns on evidence submitted by Terry himself, we hold that the trial court's valuation was not clear error. Finally, because Terry violated the trial calendar order by failing to disclose an appraisal report without good cause, we hold that the trial court's exclusion of Terry's airplane valuation expert was not an abuse of discretion. Therefore, we AFFIRM the decision of the trial court in all respects.

EASTAUGH, Justice, not participating.

**61.** *Id.* at 865–66 (quoting *Harris v. Keys,* 948 P.2d 460, 466 (Alaska 1997)).

**62.** *Id.*

**63.** *See McCubbins v. State of Alaska, Dep't of Natural Res., Div. of Parks and Recreation,* 984 P.2d 501, 508 (Alaska 1999) (exclusion of defendant's undisclosed witness after plaintiff already closed case-in-chief was not abuse of discretion, in part because court's ruling was narrowly crafted so witness could still testify on other subjects).

**64.** Alaska R. Civ. P. 16(e).

**65.** *Yukon Equip., Inc. v. Gordon,* 660 P.2d 428, 432 n. 2 (Alaska 1983).